# CIRCUIT COURT OF FAIRFAX COUNTY

Michael Covel

    v.

Town of Vienna

              Case No. CH-2003-184618

Michael Covel et al.

    v.

Town of Vienna

              Case No. CH-2003-186629

PMY Associates

    v.

Town of Vienna

              Case No. CL-2006-7105

              March 14, 2009

BY JUDGE STANLEY P. KLEIN

These consolidated cases are before the Court based upon determinations made by the Vienna Town Council ("the Town") concerning properties in Vienna owned by Petitioners Michael Covel ("Covel"), Jerome and Johanna Covel ("Dr. and Mrs. Covel"), Matthew and Susan Stich ("Stich"), and PMY, Associates ("PMY") (collectively "Petitioners"). Petitioners claim, *inter alia*, that the Windover Heights Historic District ("WHHD"), where all of the subject properties are located, was established in a manner inconsistent with statutory and constitutional law and that the decisions of the Town at issue herein were made arbitrarily and capriciously. The Town responds that the Historic District was properly created and that all relevant decisions of the Town were made after appropriate consideration of the matters brought to light during full and fair public hearings. The Court has fully considered the pleadings of the parties, the evidence presented during a three day trial, the pre-trial and post-trial briefs of the parties and the governing authorities. For the reasons set forth herein, the Court dismisses all three of these cases with prejudice.

## I. *Background*

### A. *The Applicable Town Code Provisions*

In February 1975, pursuant to the authority granted to local governments to create historic districts, the Vienna Town Council adopted Article 26, §§ 18-258 *et seq.* of the Town Code entitled "Historic Districts." Town Code § 18-258 sets out the following intent of the Town in adopting this ordinance:

> *Intent.* For the purpose of promoting the general welfare, education, and recreational pleasure of the public, *through the perpetuation of those geographical areas* or parcels of land *or individual structures* and premises which have been officially designated by the Town Council as having historic or architectural significance, historic districts are created.

Regulations within such districts are intended to protect against destruction of or encroachment upon *such areas, structures,* and premises; to encourage uses which will lead to their continuance, conservation, and improvement in a manner appropriate to the preservation of the cultural, social, economic, political, *architectural,* or archeological heritage of the Town; to prevent creation of environmental influences adverse to such purposes; and to assure that new structures and uses within each such district will be in keeping with the existing character of the district to be so preserved and enhanced by this Article.

Vienna Town Code § 18-258 (emphasis added).

Thereafter, in April 1979, the Town adopted Town Code §§ 18-280.1 *et seq.* establishing the Windover Heights Historic District. Vienna Town Code § 18-280.1 set forth the following purpose for the establishment of this overlay district:

*Purpose.* The purpose of this ordinance is to recognize and designate by an overlay to the Zoning Map of the Town of Vienna the Windover Heights Historic District of the Town, which District contains buildings and places in which historic events occurred and which have special public value because of *notable architectural features* and other features which relate to the cultural and artistic heritage of Vienna, and to provide for the preservation of that District and sites therein; the Town Council recognizing that the *District is a single family residential neighborhood which has changed little since the turn of the century, which consists mostly of older homes, open spaces, and meandering streets lined with mature trees and shrubs which constitutes one of the original residential sections of historic old Vienna and which housed citizens who were prominent in the development of the Town of Vienna.*

Vienna Town Code § 18-280.1 (emphasis added). The boundaries of the WHHD were delineated in Town Code § 18-280.2. The entirety of this Historic District was located within the confines of what constituted the Salsbury Farm in the 1800s.

In Town Code § 18-280.4 (A), the Town established that, subject to certain exceptions set out in subsection (B) of that section, a party seeking to erect a building, structure, fence, or sign within the District would first have to

obtain a Certificate of Appropriateness ("COA"). The procedure for obtaining a COA was set out in Town Code § 18-280.7. Subsection (A) of that provision mandated that a party seeking a COA commence the process by filing an application for the COA with the Town's Zoning Administrator. The Zoning Administrator would then forward the application with recommendations concerning the application to the Windover Heights Board of Review, created pursuant to Town Code § 18-280.5.

In exercising its consideration of all such applications, Town Code § 18-280.8 (A) mandated that the Board of Review, or the Town Council on appeal, consider certain delineated aspects of the structure (including fences) to be erected.

In the event the Board denied an application for a COA, the applicant could appeal the denial and, upon written request, receive a full hearing at a public meeting before the Vienna Town Council. Town Code § 18-280.10. In addition, any person aggrieved by an adverse decision by the Town Council could further appeal that decision to the Circuit Court of Fairfax County which could either: (1) reverse or modify the decision of the Town Council if it found the Council's decision to be arbitrary and an abuse of discretion or (2) affirm the Town Council's decision. Town Code § 18-280.11.

## B. *The Subject Properties*

Each of the six properties involved in these suits lies within the confines of the WHHD and has been part of this historic district since its adoption in 1979.

### 1. *130 Pleasant Street, N.W. ("130 Pleasant")*

This property was purchased by Michael Covel on October 30, 2002. Its southeastern property line serves as one of the borders of the WHHD and it lies adjacent to an office building within the 301 Maple Avenue West Complex. It is zoned RS-16 and the parcel has remained unchanged in size and shape since the late Nineteenth Century. During all relevant times, a single-family residence was located on the property. On two occasions, prior owners of 130 Pleasant had applications for COAs granted by the Town. See Pl. Exh. 124, p. 4.

On January 10, 2003, approximately two and one half months after his purchase of 130 Pleasant, Covel submitted a request to the Town to have this property removed from the WHHD. Thereafter, while the request for removal was pending, Covel submitted an application for a COA to build a fence on

this property and Covel's adjoining property at 346 Windover Avenue N.W. In his application for the COA, Covel responded "N/A" to virtually all of the Town's requested information. See Pl. Exh. 5. Along with his application, he also submitted a letter (see Def. Exh. 28) containing sixteen separate inquiries relating to the Town Code, the process of the Windover Heights Board of Review, and the Town's Windover Heights COA application form. Covel appeared at the hearings concerning his COA application before both the Board of Review and later the Town Council. At both meetings, Covel declined to supplement the information set out in his COA application by providing the colors and finishes for his proposed fence. On April 1, 2003, Covel's application for a COA to build the fence was denied as incomplete by the Board of Review by unanimous vote. See Pl. Exh. 6. On appeal to the Town Council, the application was again denied by unanimous vote as incomplete. See Pl. Exh. 8. Covel's request for removal of this property from the WHHD was also denied by unanimous vote of the Town Council on September 26, 2003. See Def. Exh. 13.

### 2. 346 Windover Avenue, N.W. ("346 Windover")

This property was obtained by Covel on March 7, 2003. It adjoins Covel's 130 Pleasant property. It also backs up to a masonry wall and a variety of plants separating the residential lot from the C-1 zoned Maple Professional Park. See Pl. Exh. 124, p. 8. At all relevant times, a single-family residence was located on this property. On two occasions, prior owners of 346 Windover had applications for COAs granted by the Town.

On March 7, 2003, the same day he obtained 346 Windover, Covel requested that it be removed from the WHHD. That request was denied on September 26, 2003, by unanimous vote of the Town Council. See Def. Exh. 13.

### 3. 224 Walnut Lane, N.W. ("224 Walnut")

This parcel was obtained by Dr. and Mrs. Covel in August 1975. It lies in the heart of the WHHD. A residence located on this property could have been built as early as 1869, but no later than 1910, as it is depicted in a 1910 photograph in the book, C. P. Stuntz and M. S. Stuntz, *This Was Vienna, Virginia: Facts and Photos* (1987) (*This Was Vienna*). The residence is apparently one of the oldest, if not the oldest residence in the WHHD. See Pl. Exh. 124, pp. 9-10. Applications for COAs submitted by Dr. and Mrs. Covel were approved by the Town on several occasions. *Id.* at pp. 10-12.

On March 17, 2003, Dr. and Mrs. Covel submitted a request that 224 Walnut be removed from the WHHD. That request was denied by unanimous vote of the Town Council on September 26, 2003. See Def. Exh. 13.

### 4. 222 Lovers Lane, N.W. ("222 Lovers")

This property was purchased by Dr. and Mrs. Covel in October 1977. The parcel lies near the intersection of Short Street and Lovers Lane in the WHHD. Its northeastern and southeastern property lines form part of the eastern boundary line of the WHHD. Extensive vegetation separates 222 Lovers from the Vienna Post Office. The parcel, along with the adjoining residential lots and most of the Post Office lot, are zoned RS-16. At all relevant times, a single-family residence was located on the property. Dr. and Mrs. Covel were granted both a variance and a COA to build an addition to the residence on this property. See Pl. Exh. 124, p. 14.

On March 17, 2003, Dr. and Mrs. Covel submitted a request that 222 Lovers be removed from the WHHD. That request was denied by unanimous vote of the Town Council on September 26, 2003. See Def. Exh. 13.

### 5. 200 Walnut Lane, N.W. ("200 Walnut")

This property was obtained by Stich on February 28, 2000. Its northeastern property line serves as one of the boundaries of the WHHD. It is zoned for single-family detached residential units. The residence on this lot is listed in the Register of Historic Structures, Sites, and Places set out in the Town's 2000 Comprehensive Plan. See Pl. Exh. 124, p. 16. Two applications for COAs for 200 Walnut were granted to prior owners of this property.

A request for removal of 200 Walnut from the WHHD was submitted by Stich on March 17, 2003. It was denied by unanimous vote of the Town Council on September 26, 2003. See Def. Exh. 13.

### 6. 210 Lawyers Road, N.W. ("210 Lawyers")

This property was purchased by PMY Associates in 2003. The partners of PMY Associates include Paul Henon and Michael Stich. Its eastern line serves as part of the eastern border of the WHHD. The property adjoins the Post Office and an old church. On two occasions, COAs were obtained by PMY for construction on 210 Lawyers.

On November 6, 2005, PMY requested to have 210 Lawyers removed from the WHHD. A public hearing was held on the request on April 17, 2006, at which Michael Covel, Paul Henon, Dr. Jerome Covel, and Michael Stich all

addressed the Town Council. See Pl. Exh. 12. The request was deferred to the May 8, 2006, meeting of the Town Council at which time it was denied. See Pl. Exh. 13.

## C. *The Relevant Proceedings*

Covel initiated this litigation on June 18, 2003, when he filed his initial Motion for Declaratory Judgment in CH-2003-184618 ("Fence Case"). This suit arose out of the Town's denial of Covel's request for a COA to build a fence along the rear property line of Covel's 130 Pleasant Street property. The Town filed both a demurrer and a plea in bar to this chancery action. After a hearing, this Court ruled that a declaratory judgment action was not the appropriate mechanism for the relief requested, based upon the allegations in Covel's suit. As a result, by order entered September 5, 2003, the Court sustained the demurrer but granted Covel leave to file an amended pleading within fourteen days. The Court overruled the plea in bar

On September 23, 2003, Covel filed a five count Amended Appeal and Request for Review of Town Council Decision and Motion for Declaratory Judgment. Although the Amended Appeal was in fact filed more than fourteen days after entry of the Court's September 5, 2003, Order, the filing of the Amended Appeal has been deemed timely by way of an additional order entered March 13, 2009. In Count I, Covel appealed the Town's adverse ruling on his application for a Certificate of Appropriateness. In Count II, Covel once again sought declaratory relief; however, the relief sought was now limited to a declaration (1) that Vienna Town Code § 18-258 *et seq.*, and particularly Town Code § 18-280.1 *et seq.*, are unconstitutionally vague, both as written and applied and (2) that the original designation of The Historic District was *ultra vires* and void *ab initio* because Town Code §§ 18-280.1 *et seq.* did not designate "historic landmarks" as required by both the Town Code and Virginia Code § 15.2-2306. In Count III, Covel sought relief for violation of his right to equal protection of the law under the Fourteenth Amendment to the Constitution of the United States. In Count IV, Covel sought relief for a violation of his substantive due process rights under both the Virginia and the United States Constitutions. Finally, in Count V, Covel sought relief pursuant to 42 U.S.C. § 1983.

The Town demurred to Covel's amended pleading, and, after full briefing and a hearing, the Court overruled the demurrer to Counts I, II (in part), III, and IV but ruled that Town Code § 18-280.8 (matters to be considered by The Historic District's Board of Review in passing on an application for a Certificate of Appropriateness to build in the WHHD) was

not unconstitutionally vague on its face and sustained the demurrer to Count V with leave to amend within ten days. An order reflecting the Court's ruling was entered on January 23, 2004. An Amended Count V was timely filed on February 2, 2004. An additional demurrer was filed to this pleading.

While Covel and the Town were briefing their positions in response to the Town's demurrer to Covel's amended pleading in the Fence Case, Covel, Dr. and Mrs. Covel, and Stich filed a separate suit against the Town on October 22, 2003. (CH-2003-186629, "Removal Case"). This five count action basically mirrored Counts II through V of the Fence Case but, in Count I, each of these petitioners appealed the Town's September 22, 2003, decision denying their requests to have their properties removed from The Historic District. Once again, the Town demurred, and the parties fully briefed the issues. By order entered January 13, 2005, the Court overruled the demurrer to Counts I, II, III, and IV but sustained the demurrer to and dismissed the 1983 claim set out in Count V. A similar order was entered that same day dismissing Count V in the Fence Case based upon the Town's demurrer to the Amended Count V in that case.

This litigation then became dormant until June 7, 2006, almost one and a half years later, when PMY filed Case No. CL-2006-7105 ("PMY Case"), appealing the Town's May 8, 2006, decision to reject PMY's request to be removed from the WHHD. Although the Town demurred in the PMY case as well, the parties never requested the Court to rule on the Town's demurrer in that case.

The litigation then resumed its dormant status once again until a discovery dispute arose in mid-2007, which was resolved by counsel without court intervention. Thereafter, in late January 2008, the parties appeared before this judge in calendar control and set all three cases for trial on October 20-22, 2008, over five years after Covel had filed his initial lawsuit against the Town.

By Consent Order entered August 8, 2008, the parties agreed that the three cases should be consolidated for trial and that the Court's ruling in the Fence Case that Town Code § 18-280.8 was not unconstitutionally vague on its face would apply in all three cases. These cases were never entered into the Fairfax Circuit Court's case tracking program as they were non-domestic relations chancery cases.

On March 28, 2008, counsel for the Petitioners advised counsel for the Town in writing that she wanted to depose those individuals associated with the Town who "were directly involved in the facts and circumstances associated with the enactment, amendment, and enforcement of Vienna's Historic District ordinance since its inception in 1975." See March 28, 2008,

letter of Debra Fitzgerald-O'Connell filed in court on May 23, 2008, in the Removal Case. The list of potential deponents included all of the members of the Vienna Town Council from 1975 forward as well as all persons who had served on the Windover Heights Board of Review since its inception in 1979. Counsel's letter was met with a Motion for a Protective Order for Local Legislators filed by the Town. The Town claimed that Petitioners were not entitled to take these depositions because (1) the burden and expense of these depositions warranted judicial intervention pursuant to Rule 4:1(c) of the Rules of the Supreme Court of Virginia; (2) the pending actions were in essence appeals of determinations made by the Vienna Town Council in which no evidence could be introduced other than the record of the proceedings before the Town Council; and (3) the taking of the depositions of local legislators about their decisions and the deliberations leading to those decisions would violate the Speech or Debate Clauses of the United States and Virginia Constitutions.

After full briefing and oral argument by the parties, the Town's motion was granted by order entered May 23, 2008. The Court ruled principally that the time and expense of the requested depositions were not warranted under the then existing circumstances, as it was uncertain whether any evidence concerning the decision-making process leading to the appeals in these cases would be admissible at trial. Virginia Code § 15.2-2314 authorized the taking of such additional testimony only upon a court determination at the hearing that the presentation of testimony was necessary for the proper resolution of the cases. As a result, the Court temporarily limited discovery to requests for written clarification of the public record from the Town to the extent it was illegible or inaudible.

Next, in early August 2008, counsel advised the Court that they might be able to stipulate to the material facts in the cases and, as a result, the Court could potentially resolve the legal issues in these cases through a Motion for Summary Judgment. The Town filed such a motion, and after briefing, a hearing was held on September 26, 2008. Notwithstanding the obvious good faith efforts of all counsel to reach appropriate stipulations, material issues of fact remained in dispute and the Court denied the motion. Petitioners, however agreed at the hearing that their remaining constitutional and 1983 claims would not be viable, based upon the evidence to be presented at trial. Consequently, a Motion to Nonsuit Counts III, IV, and V of both the Fence Case and the Removal Case was made and granted without objection. The nonsuit of Count V in each case was improper, however, as these counts had previously been dismissed at the demurrer stage by orders entered January 13, 2005. As it appeared that evidence would have to be admitted at trial, the

Court invited counsel to re-open discovery to the extent they deemed it necessary and to advise the Court of any difficulties they experienced. The Court was not thereafter advised of any additional discovery disputes. On September 26, 2008, the Court entered an additional order consolidating the three cases for trial.

The parties and their witnesses appeared for trial on October 20, 2008. The Court was advised that morning that Petitioners had issued trial subpoenas for various members of the Town Council and a member of the Windover Heights Board of Review. As a result, the Court entertained further argument on the Speech or Debate Clause issue before the commencement of the trial.

## II. *Analysis*

### A. *Speech or Debate Clause Issue*

The Speech or Debate Clause of the Constitution of the United States provides in pertinent part that "for any Speech or Debate in either House; they [Senators and Representatives] shall not be questioned in any other place." U.S. Const., Art. I, § 6. The Virginia Constitution contains virtually identical language. It reads that "for any speech or debate in either house [Senators and Delegates] shall not be questioned in any other place." Va. Const., Art. IV, § 9. The power to invoke this legislative privilege is not unique to the United States and Virginia Constitutions. Over forty of the constitutions of the individual states have similar provisions protecting the right of legislators to speak and act freely without fear of thereby becoming involved in collateral judicial proceedings. *See Tenney v. Brandhove*, 341 U.S. 367, 375 n. 5, 71 S. Ct. 783, 95 L. Ed. 1019 (1951).

The genesis of this legislative privilege does not arise however from the language of these constitutions. To the contrary, the power to invoke this privilege was recognized as so essential to the workings of the people's representatives that it was included in both the English Bill of Rights of 1689 and the Colonies' Articles of Confederation. *See Tenney v. Brandhove*, 341 U.S. at 372. Indeed, its roots date back to the Sixteenth Century struggles for increased independence for Parliament from the British Crown. *Id.* The underlying rationale for this privilege was perhaps best articulated by James Wilson, a member of the Committee of Detail responsible for the inclusion of the Speech or Debate Clause in the U.S. Constitution. Wilson wrote:

> In order to enable and encourage a representative of the public to discharge his public trust with firmness and success, it is indispensably necessary that he should enjoy the fullest liberty of speech, and that he should be protected from the resentment of everyone, however powerful, to whom the exercise of that liberty may occasion offence.

*Id.* at 373 (quoting 2 *Works of James Wilson* 38 (Andrews ed. 1896)).

Although the "central role" of the clause in the United States Constitution is to "prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary," *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 502, 95 S. Ct. 1813, 44 L. Ed. 2d 324 (1975) (*quoting United States v. Johnson*, 383 U.S. 169, 181, 86 S. Ct. 749, 15 L. Ed. 2d 681 (1966)), the United States Supreme Court has consistently held that the Clause provides protection not only against actions brought by the Executive Branch but also against actions brought by private citizens. *Eastland*, 421 U.S. at 502-03 (citations omitted). The *Eastland* Court noted that "without exception, [the Supreme Court's] cases have read the Speech or Debate Clause broadly to effectuate its purposes." *Id.* at 501 (citations omitted). The Supreme Court explicitly accepted that "legislators acting within the sphere of legitimate legislation activity 'should be protected not only from the consequences of litigation's results but also from the burden of defending themselves'." *Id.* at 503 (*quoting Dombrowski v. Eastland*, 387 U.S. 82, 85, 87 S. Ct. 1425, 18 L. Ed. 2d 577 (1967)). The Court recognized that private civil actions could be utilized to disrupt the legislative function and cause legislators "to divert their time, energy, and attention from their legislative tasks . . ." to address the litigation. *Eastland*, 421 U.S. at 503. And, even when such litigation was initiated by private individuals, the power of the judiciary could nonetheless be brought to bear on the legislative branch, thereby potentially threatening the legislative independence which went to the very heart of this legislative privilege. *Id.* Thus, the *Eastland* Court reaffirmed that "once it is determined that members are acting within the 'legitimate legislative sphere' the Speech or Debate Clause is an *absolute bar to interference*." *Id.* (emphasis added).

Here, in their Supplemental Memorandum on this issue, Petitioners asserted that they wanted the Town Mayor, three members of the Town Council, and one member of the Windover Heights Board of Review to testify at trial and had issued trial subpoenas to those individuals. Petitioners claimed that (1) the Town officials were not "entitled to invoke legislative privilege pursuant to the Speech and Debate clause of the United States and Virginia

Constitutions;" (see Plaintiffs Supplemental Memorandum in Opposition to Defendant's Motion for a Protective Order for Local Legislators, p. 2) and (2) they merely wanted to ask the Council Members to explain "the definition of specific terms used by members of the Town Council during the hearings that form the basis of these lawsuits" and to ask the Board Member to explain the basis for his motion to reject Michael Covel's application for a Certificate of Appropriateness "for its lack of completeness of application." *Id.* at pp. 2-3. Petitioners contended that they needed this testimony to meet their burden of proof with respect to the Town's failure to comply with Va. Code § 15.2-2306 and/or the reasonableness of the actions of the Town. . . ." *Id.* at p. 3. Ultimately, Petitioners sought to call these witnesses at trial to explain why the Town Council members believed that removal of Petitioners' properties from the WHHD would allow "architecturally inconsistent structures" (*id.* at p. 2) to be introduced in the Historic District and why Board Member Bukont believed that Michael Covel's fence application was incomplete. This Court concluded that to allow Petitioners to call these witnesses for those purposes would require the Court to ignore the legislative privilege embodied in this state's and this nation's Constitutions. As a result, the Court granted the Town's Motion to Quash for multiple reasons.

First, Petitioners did not explain why they contended that the Town's legislative personnel they had subpoenaed to testify at trial were not covered by the legislative privilege embodied in the Speech or Debate Clause. As this privilege was rooted in the common law long before passage of the United States and Virginia Constitutions, its scope clearly extended beyond those elected representatives enumerated in the respective Constitutions. Indeed, in *Tenney v. Brandhove*, the Supreme Court found the legislative privilege embodied in the United States Constitution applicable to a member of the California state legislature. See *Tenney*, 341 U.S. at 372-76.

Further, decisions of the Supreme Court of Virginia have established that the members of the Town Council and the Board of Review were serving in legislative capacities when they rendered the decisions leading to these consolidated suits. In *Norton v. City of Danville*, 268 Va. 402, 602 S.E.2d 126 (2004), the Supreme Court of Virginia reiterated the principle that "when a governing body of any locality reserves unto itself the right to issue special exceptions, the grant or denial of such exceptions is a legislative function." *Id.* at 408, 602 S.E.2d at 129-30. Continuing, the Court analogized the city council's action on Norton's application for a certificate of appropriateness to such legislative action. *Id.* at 408, 602 S.E.2d at 130. As the actions of the Vienna Town Council were therefore legislative in nature, the same decision-making by the Windover Heights Board of Review was necessarily equally legislative.

Moreover, as argued by the Town on brief (see Defendant's Brief in Support of Motion for a Protective Order for Local Legislators, pp. 7-8), the power to invoke legislative privilege was implicitly made applicable to all cities and towns in Va. Code § 15.2-1102, which reads in pertinent part as follows:

> A municipal corporation shall have and may exercise all powers which it now has or which may hereafter be conferred upon or delegated to it under the Constitution and laws of the Commonwealth and all other powers pertinent to the conduct of the affairs and functions of the municipal government, the exercise of which is not expressly prohibited by the Constitution and the general laws of the Commonwealth. . . .

Va. Code Ann. § 15.2-1102.

As recognized by the United States Supreme Court in *Eastland*, invocation of this privilege prevents private lawsuits from disrupting the legislative function and diverting the attention of legislators from their legislative tasks to tasks surrounding litigation arising from performance of their legislative duties. The importance of the ability of such legislators to remain focused on the ongoing business of their constituents is particularly important here in Virginia where many legislators work only on a part-time basis and are required to secure other employment to supplement any income they earn as legislators. Moreover, as the United States Supreme Court has recognized, this doctrine of legislative immunity was created not for the personal benefit of those in the legislative branch of government "but to protect the integrity of the legislative process by insuring the independence of individual legislators." *United States v. Brewster*, 408 U.S. 501, 507, 92 S. Ct. 2531, 33 L. Ed. 2d 507 (1972); *see also Powell v. McCormack*, 395 U.S. 486, 503, 89 S. Ct. 1944, 23 L. Ed. 2d 491 (1969) (articulating legislative immunity "insures that legislators are free to represent the interests of their constituents without fear that they will be later called to task in the courts for that representation").

Ultimately, as Petitioners essentially conceded in their Supplemental Memo, they wished to call these individuals to inquire into their thought processes concerning their legislative acts because such "information is essential to their ability to meet their burden of proof with respect to the Town's failure to comply with Va. Code Ann. § 15.2-2306 and/or the reasonableness of the actions of the Town. . . ." See Plaintiffs Supplemental Memorandum in Opposition to Defendant's Motion for a Protective Order

for Local Legislators, p. 3. In essence, Petitioners asked this Court to require these Town legislators to appear in court to be examined "about the rationale underlying their legislative acts and/or the definition of specific terms used by [them] during the hearings that form the basis of these lawsuits." *Id.* at p. 3. Thus, they requested this Court, through its subpoena powers, to require legislators to appear in some "other place" to "be questioned" about what they thought and meant during the "speech or debate" surrounding the specific legislative acts in question here. It would be difficult to imagine a scenario where the legislative privilege inherent in the Speech or Debate Clause would be more clearly implicated. As Petitioners do not claim that they desire to examine any of these Town Officials concerning news releases or speeches made outside of a meeting of the Town Council or the Review Board, the Court need not address the line drawn by the court in *Greenburg v. Collier*, 482 F. Supp. 200, 202-03 (E.D. Va. 1979). The Petitioners' argument that they had to meet a burden of proof to show that the legislative action they challenge herein was unreasonable, arbitrary, or capricious provided this Court no basis to ignore these long-recognized common law and constitutional privileges. Indeed, for centuries, the United States Supreme Court has rejected any argument that alleged improper motives of legislators could provide a basis for finding a waiver of the power to invoke this privilege. *See United States v. Johnson,* 383 U.S. 169, 180, 86 S. Ct. 749, 15 L. Ed. 2d 681 (1966) (*quoting Tenney v. Brandhove,* 341 U.S. at 377) (saying "[t]he claim of an unworthy purpose does not destroy the privilege. . . . The holding of this Court in *Fletcher v. Peck,* 10 U.S. 87, 6 Cranch 87, 130, 3 L. Ed. 162 [1810], that it was not consonant with our scheme of government for a court to inquire into the motives of legislators, has remained unquestioned.").

> Our cases make clear that in determining the legitimacy of a congressional act, we do not look to the motives alleged to have prompted it. *Watkins v. United States,* 354 U.S. 178, 200, 77 S. Ct. 1173, 1 L. Ed. 2d 1273, 76 Ohio Law Abs. 225 (1957); *Hutcheson v. United States,* 369 U.S. 599, 614, 82 S. Ct. 1005, 8 L. Ed. 2d 137 (1962). In *Brewster,* we said that "the Speech or Debate Clause *protects against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts.*" 408 U.S. at 525 (emphasis added). And in *Tenney v. Brandhove,* we said that "*[t]he claim of an unworthy purpose does not destroy the privilege.*" 341 U.S. at 377. If the mere allegation that a valid legislative act was

> undertaken for an unworthy purpose would lift the protection of the Clause, then the Clause simply would not provide the protection historically undergirding it.

*Eastland*, 421 U.S. at 508-09 (emphasis added). Indeed, to accept Petitioners' argument would allow an oft-rejected exception to undermine, if not entirely eviscerate, a rule whose pedigree cannot be seriously questioned. As a result, the Town's Motion to Quash the Subpoenas issued for members of the Vienna Town Council and the Windover Heights Historic District's Board of Review was granted.

## B. *Petitioners' Merits Contentions*

In their suits against the Town, Petitioners raise various arguments in support of their contention that this Court must (1) issue a declaratory judgment that the Windover Heights Historic District is invalid in its entirety both as adopted and as applied to the Petitioners and (2) reverse the Town Council's decisions in 2003 and 2006 concerning Petitioners' properties in the WHHD. Although the Court agrees that there is some overlap to the arguments advanced in the counts setting out Petitioners' appeals and those seeking declaratory judgment, the Court does not agree with the Town's position that the overlap is fatal to the counts relating to the Petitioners' appeals. As a result, the Court will address each of the arguments advanced by Petitioners.

### (1) *That the Windover Heights Historic District Was Invalidly Adopted*

Petitioners contend that Vienna Town Code §§ 18-280.1 *et seq.* are void *ab initio* because (1) the General Assembly did not delegate to the Town the authority to enact an historic district without concurrently designating qualified buildings or structures within the district as "historic," and, therefore, the enactment ran afoul of "Dillon's Rule" and (2) the amendment to the Town Code adding §§ 18-280.1 *et seq.* failed to comply with the requirements of Vienna Town Code §§ 18-258 *et seq.* (specifically § 18-261), the original historic district provisions of the Vienna Town Code.

Count II of both the Fence Case and the Removal Case seek declaratory judgments that the WHHD is void. Although the contents of Count I in all three of these consolidated actions contain allegations challenging the propriety of the enactment of the ordinance establishing this historic district, such a challenge cannot be lodged in an appeal of a decision made by a local legislative body

enforcing its historic district. *Norton v. City of Danville*, 268 Va. 402, 407-08, 602 S.E.2d 126, 126-29 (2004). Virginia's historic district enabling statute, Va. Code § 15.2-2306(A), limits judicial review of such decisions made by a locality to whether the decision is "arbitrary and constitutes an abuse of discretion" or is "contrary to law." *Id.* Thus, this Court's analysis of the enactment issues is limited to the declaratory judgment counts.

### a. *Declaratory Judgment*

Virginia Code § 8.01-184 provides this Court with the power to "make binding adjudications of right" in cases of "actual controversy." The purpose of Va. Code § 8.01-184 is remedial. The statute was enacted "to afford relief from the uncertainty and insecurity attendant upon controversies over legal rights, without requiring one of the parties interested so to invade the rights asserted by the other as to entitle him to maintain an ordinary action therefor." Va. Code § 8.01-191. *See also Liberty Mutual Ins. Co. v. Bishop*, 211 Va. 414, 418, 177 S.E.2d 519, 522 (1970) (*citing Criterion Ins. Co. v. Grange Mutual*, 210 Va. 446, 448-49, 171 S.E.2d 669, 671 (1970)). A declaratory judgment action is intended to provide preventative relief. *Williams v. Southern Bank of Norfolk*, 203 Va. 657, 662, 125 S.E.2d 803, 807 (1962). In cases where "a right has matured or a wrong has been suffered, customary processes of the court, where they are ample and adequate, should be adopted." *Id.* Thus, the authority to issue a declaratory judgment will generally not be exercised where some other mode of judicial proceeding can be utilized. *Bishop*, 211 Va. at 420, 177 S.E.2d at 523. However, where the controversy surrounds the parties' definitively stated rights, status, or relationship, generally as set forth in a writing, relief by way of a declaratory judgment is appropriate. *Id.* (*citing American Nat'l Bank & Trust Co. of Danville. v. Kushner*, 162 Va. 378, 386, 174 S.E. 777, 780 (1934)). *See Board of Supervisors, Loudoun County v. Town of Purcellville*, 276 Va. 419, 435, 666 S.E.2d 512, 520 (2008). Here, both the rights of the Petitioners to make use of their properties in the future as well as the Town's right to enforce the WHHD based upon the validity of its ordinance are implicated. Thus, Count II of both the Fence Case and the Removal Case present justiciable controversies appropriate for potential declaratory judgment relief.

### b. *Enabling Legislation; State Statutes*

It is now axiomatic that a legislature may, in the exercise of its inherent police power, appropriately restrict its citizens' personal and property rights to further the public's health, safety, and general welfare. *Gorieb v. Fox*, 274

U.S. 603, 608, 47 S. Ct. 675, 71 L. Ed. 1228 (1927) (citations omitted). Moreover, it is equally well-settled that a legislature may delegate this police power to cities and towns located within its jurisdiction. Pursuant to this delegable police power, legislatures may also authorize division of these localities into districts where property owners must limit use of their properties. *Id.* Hence, any analysis of the validity of Vienna Town Code §§ 18-280.1 *et seq.* must initially address whether the Virginia General Assembly properly delegated to the Town of Vienna the authority to enact such legislation or whether the enactment of the ordinance violated Dillon's Rule. In Virginia, Dillon's Rule provides as follows:

> It is a general and undisputed proposition of law that a municipal corporation possesses and can exercise the following powers and no others: First, those granted in express words; second, those necessarily or fairly implied in or incidental to the powers expressly granted; third, those essential to the declared objects and purposes of the corporation, not simply convenient but indispensable.

*Board of Supervisors of Loudoun County*, 276 Va. at 437, 666 S.E.2d at 520-21 (*quoting City of Richmond v. Board of Supervisors*, 199 Va. 679, 684, 101 S.E.2d 641, 645 (1958)). This Court must therefore examine the language of the statutes which authorized the Town of Vienna to create the WHHD.

In 1979, when the WHHD was created, Va. Code § 15.1-503.2(a) (now 15.2-2306) governed the rights of local governing bodies to establish historic districts. That code section then read in pertinent part as follows:

> § 15.1-503.2. *Preservation of historical sites and areas in counties and municipalities.* — (a) The governing body of any county or municipality may adopt an ordinance setting forth the historic landmarks within the county or municipality as established by the Virginia Historic Landmarks Commission, and any other buildings or structures within the county or municipality having an important historic, architectural, or cultural interest, *and any historic areas within the* county or *municipality as defined by § 15.1-430(b) of the Code of Virginia,* amending the existing zoning ordinance and delineating one or more historic districts adjacent to such landmarks, buildings, and structures, or encompassing such historic areas. . . . The governing body may provide for an

architectural review board to administer such ordinance. Such ordinance may include a provision that no building or structure, including signs, shall be erected, reconstructed, altered, or restored within any such historic district unless the same is approved by the architectural review board or, on appeal, by the governing body of such county or municipality as being architecturally compatible with the historic landmarks, buildings, or structures therein.

*Id.* (1977) (emphasis added). Va. Code § 15.1-503.2 was amended and reenacted on March 28, 1977, creating the version of the statute in effect in 1979 when the Town created the WHHD. *See* 1977 Va. Acts 473. Va. Code § 15.1-430(b) (1978) then defined "Historic Area" as:

an *area containing* buildings or places in which historic events occurred or having special public value *because of notable architectural* or other *features* relating to the cultural or artistic heritage of the community, of such significance as to warrant conservation and preservation.

*Id.* (1978) (emphasis added). See 1978 Va. Acts 320.

Petitioners contend that Town Code § 15.1-503.2 required the Town to designate *specific* historic landmarks, buildings, or structures within the WHHD in order to validly enact the ordinance creating the district. As no specific designation of such landmarks was set out in the ordinance creating the WHHD, Petitioners assert that the ordinance was not validly enacted. The Town responds that Petitioners misread the enabling statutes and that designation of areas containing such structures is sufficient to comply with the statutory mandate. As Town Code § 18-280.2 delineated the area containing such structures, the Town posits that the ordinance satisfied the requirements of the enabling legislation.

Fundamental principles of statutory construction inform the Court's decision on this issue. It is elementary that, when interpreting a statute, a court must determine and give effect to the legislature's intent. *Ogunde v. Commonwealth*, 271 Va. 639, 644, 628 S.E.2d 370, 372 (2006); *Boynton v. Kilgore*, 271 Va. 220, 227, 623 S.E.2d 922, 925 (2006). In ascertaining that intent, a court is bound by the plain language of an unambiguous statute. *Ogunde*, 271 Va. at 644, 628 S.E.2d at 372; *Brown v. Lukhard*, 229 Va. 316, 321, 330 S.E.2d 84, 87 (1985). When interpreting a statute, a court should give effect to all of the words of the statute and assume that the legislature did

not needlessly add words to it. *Jones v. Conwell*, 227 Va. 176, 181, 314 S.E.2d 61, 64 (1984) (stating "[t]he rules of statutory interpretation argue against reading any legislative enactment in a manner that will make a portion of it useless, repetitious, or absurd . . . it is well established that every act of the legislature should be read so as to give reasonable effect to every word).

Here, Petitioners attempt to write words and phrases out of the relevant statutory provisions, in contravention of the above-stated principles of statutory construction. Contrary to the Petitioners' position, Virginia Code § 15.1-503.2 (1977) authorized a local governing body to adopt an historic district ordinance setting forth, *inter alia*, "any historic areas within the county or municipality as defined by § 15.1-430(b) of the Code of Virginia, amending the existing zoning ordinance and delineating one or more historic districts . . . *encompassing such historic areas.*" Va. Code § 15.1-503.2 (emphasis added). "Historic area" was defined by then existing Virginia Code § 15.1-430(b) as "an area containing buildings or places in which historical events occurred or having special public value because of notable *architectural* or other features. . . ." *Id.* (emphasis added). Thus, the plain and unambiguous language of the enabling statutes authorized areas, in addition to buildings or structures, to be designated in ordinances creating historic districts. The Vienna Town Council clearly designated such an historic area in Town Code §§ 18-280.1 and 18-280.2. In Town Code § 280.1, the Town articulated its intent and purpose to designate the Windover Heights Historic District, "which area contains buildings and places in which historic events occurred and which have special public value because of notable *architectural features.* . . ." *Id.* (emphasis added). This section further set forth the Town Council's recognition of the WHHD as a residential neighborhood which had changed little since the turn of the Twentieth Century, consisted of older homes on meandering streets lined with mature trees and vegetation and which had housed people who were prominent in the history of Vienna. And, in Town Code § 280.2, the Council had designated the specific boundaries of "*the area* known for many years as . . . The Hill." *Id.* Hence, the statutory requirements set out in former Virginia Code § 15.1-503.2 were satisfied by the language of the provisions of the Town Code establishing the WHHD.

In addition, there was a legitimate factual predicate for the language utilized by the Town Council in the WHHD ordinance. Public hearings were held by both the Planning Commission on February 14, 1979, and the Town Council on March 12, 1979. At the hearing before the Planning Commission, eleven different citizens testified in favor of the proposal to create the WHHD. See Def.'s Exh. 30. Witnesses testified that the proposed district represented the oldest part of Vienna and contained specific architectural features

representative of the Nineteenth Century. *Id.* at Bates # 000002. The Planning Commission's report of March 8, 1979, further noted that historic places such as Salsbury Spring, the Salsbury House, and the first black public school were to be included in the proposed district. *Id.* at Bates # 000004. The record is in conflict as to the Commission's ultimate position on the proposed district. Compare *Id.* at Bates # 000000 with Bates # 000004. Ultimately, the Planning Commission's recommendation is not determinative. Further, the Town Council was presented with a letter from a representative of the National Trust for Historic Preservation, recommending designation of the WHHD as an historical district because its "historical association," "structures of architectural merit," and "strong sense of physical identity" made it worthy of such consideration. See Def. Exh. 30, Bates # 000006. This evidence, supportive of the adoption of the ordinance creating the WHHD, was corroborated by other evidence adduced at trial, including the testimony of Warren Lee Almquist, the report of Gregory Henbree (see Pl. 124), and the book *This Was Vienna*. See Def.'s Exh. 6. This book will be further discussed *infra*.

Thus, there is both a legal and a factual basis for concluding that the WHHD was properly created pursuant to authority delegated to the Town by the Virginia General Assembly. Consequently, the Court rejects the Petitioners' position that the WHHD is void as invalidly enacted based upon non-compliance with the requirements of the Virginia Code.

### c. *Enabling Legislation; Vienna Town Ordinance*

Petitioners further contend that the WHHD was invalidly enacted, because the Town failed to comply with the requirements of the Vienna Town Code itself concerning amendments to sections relating to historic districts in the Town. Specifically, Petitioners argue that the Town failed to comply with the dictates of Town Code § 18-261 when it enacted Town Code § 18-280.1 *et seq.*, creating the WHHD. Town Code § 18-261 reads as follows:

> *Establishment of and Amendments to Historic District Boundaries And Regulations.* Amendments to the provisions of this section, as well as to any historic district shall be in accordance herewith. The Planning Commission or any interested citizen may propose to the Town Council, or the Council of its own initiative may propose, such amendments as deemed appropriate, including the establishment of historic districts. Upon receipt of said proposal, the Town Council shall

refer the same to the Planning Commission. The Planning Commission shall prepare and submit to the Town Council a recommendation in the form of a written report on the proposed amendment. Such report shall establish and define the historic district boundaries as well as the historic and/or architectural significance of the buildings, structures, or sites to be protected, and describe present trends, conditions, and desirable public objectives for preservation. In addition, such report shall include the following specific matters:

a. An analysis of existing structures by period of construction, architectural style, condition, and other matters relating to planning or regulating future development, such as location on lots, location of yards and other open spaces, access to interior of lots, and off-street parking provided. In addition to general analysis, two specific and detailed descriptions shall be entered:

(1) A description of individual structures and premises of substantial public interest, with maps, photographs, and other data indicating the public importance of their preservation and the particular features it is desired to preserve;

(2) A description of existing structures, premises, and uses likely to have an adverse effect on the desired character of the district, including those near and visually related to the district, with maps, photographs, and other data indicating the reasons for such an effect.

b. An analysis of lands not occupied by structures, including lands near and visually related to the district. For public lands, ownership, use, and location shall be indicated. For private lands, assessed valuation shall be added as well as existing zoning and planned land use.

c. Recommendations concerning detailed regulations, if any, to be applied within the district, to supplement or modify general regulations set forth herein, providing such regulations shall promote the general intent of this Article and shall be made only for the express purpose of preventing changes which are architecturally incompatible with the buildings, structures, or sites to be preserved. (Amend. 6-84) 18-215 § 18-261 Zoning § 18-265.

> d. In preparation of the said report, the Planning Commission shall be entitled to call upon the services of the Architectural Review Board, the Zoning Administrator, and the Department of Public Works.

Vienna Town Code § 18-261. Petitioners concede that the Planning Commission did prepare and present reports to the Town Council concerning the proposed WHHD in 1978 and 1979 (see Def. Exh. 30, Bates # 006002-04 and # 000022-23), but they assert that the Planning Commission report did not define the historic or architectural significance of the structure within the boundaries of the proposed district, nor did it describe the trends, conditions, or desirable public objectives supporting preservation of such structures as required by Town Code § 18-261. They further contend that subsections (a)(1), (a)(2), (b), and (c) of Town Code § 18-261 were basically ignored by the Planning Commission.

The Town responds that all legislative enactments are presumed to have been validly enacted and that Petitioners have not established that the only reports from the Planning Commission concerning the proposed WHHD were contained in Def. Exh. 30. See *Town of Madison v. Ford*, 255 Va. 429, 438, 498 S.E.2d 235, 239 (1998) ("When a legislative body performs its law-making function, courts must accord the legislative action 'every reasonable presumption' of validity.") (Compton, J., dissenting) (*citing Wise v. Bigger*, 79 Va. 269, 281 (1884)). The Town further asserts that, even if there was non-compliance with Town Code § 18-261, Virginia Code § 15.2-1427(C) renders this argument by Petitioners moot.

The Court finds that the reports from the Planning Commission contained within Def. Exh. 30 do not satisfy the requirements of Town Code § 18-261. Further, the Court will assume, without deciding, that these reports were the only reports submitted by the Planning Commission to the Town of Vienna concerning the proposed WHHD, and, therefore, Petitioners have rebutted the presumption of the valid enactment of this legislation. Nonetheless, the Court finds Petitioners' argument on this issue unavailing as it agrees with the Town that the effect of Va. Code § 15.2-1427(C) is dispositive.

Virginia Code § 15.2-1427(C) reads as follows:

> All ordinances or resolutions heretofore adopted by a governing body shall be deemed to have been validly adopted, unless some provision of the Constitution of Virginia or the Constitution of the United States has been violated in such adoption.

*Id.* The language of this Code provision was embodied in former Va. Code § 15.2-504, as it existed in 1979, and has been reenacted either as that section or the present Va. Code § 15.2-1427(C) in 1983, 1997, 1998, and 2003. As its language is plain and unambiguous, the Court must give effect to the legislature's intention. *Ogunde v. Commonwealth*, 271 Va. 639, 644, 628 S.E.2d 370, 372 (2006); *Chase v. DaimlerChrysler Corp.*, 266 Va. 544, 547, 587 S.E.2d 521, 522 (2003). Clearly, the General Assembly intended that all prior ordinances enacted by governing bodies were to be deemed validly adopted, absent some constitutional infirmity. Petitioners do not claim a constitutional violation occurred when the Town enacted Code § 18-280.1, *et seq.* Their argument here is premised upon violation of an ordinance, not a provision of either the state or Federal constitutions. As this statutory provision has been reenacted on multiple occasions since the 1979 adoption of the WHHD, the ordinance creating the district is deemed, by statute, to have been validly adopted.

Relying on the decision in *Gas Mart Corp. v. Board of Supervisors*, 269 Va. 334, 611 S.E.2d 340 (2005), Petitioners argue that Va. Code § 15.2-1427(C) does not control the resolution of this issue, because it is a general statute that cannot nullify a specific legislative enactment. Petitioners' reliance on *Gas Mart* is misplaced. In *Gas Mart*, the Court addressed the apparent conflict between Va. Code § 15.2-1427(*F*) and Va. Code §§ 15.2-2204 and 15.2-2285. The Supreme Court held that, when two state statutes are in conflict, the specific statute will trump the general statute. *Id.* at 350, 611 S.E.2d at 348. Here, however, Petitioners claim there is a conflict between a *state statute* and a *local ordinance*. *Gas Mart* is, therefore, inapposite, as fundamental principles of Virginia law would preclude the Court from ruling that a local ordinance can override the dictates of a state statute. Consequently, Va. Code § 15.2-1427(C) precludes Petitioners from attacking the validity of the ordinance underlying the WHHD based upon the Town's alleged non-compliance with Vienna Town Code § 15-261.

As the Court has determined that the enactment of Town Code § 18-280.1 *et seq.* did not violate the requirements of former Va. Code § 15.1-503.2 (now § 15.2-2306), the Court need not decide whether Va. Code § 15.2-1427(C) also precludes Petitioners' argument that the ordinance was invalidly enacted because of non-compliance with this state statute.

*(2) That Vienna Town Code §§ 18-280.1 et seq. Is Unconstitutionally Vague on Its Face and As Applied to Petitioners*

In their initial pleadings, Petitioners further alleged that the Town Code sections also suffer from impermissible overbreadth. As no such argument was advanced during these proceedings either orally or on brief, the Court will deem this position abandoned.

In Count II of both the Removal Case (Appeal and Request for Review of Decision Of Vienna Town Council and Motion for Declaratory Judgment, ¶ 38) and the Fence Case, Petitioners allege that "Vienna Town Code §§ 18-258 *et seq.* and more particularly the Windover Heights Historic District Ordinances §§ 18-280.1 *et seq.* is constitutionally vague and ambiguous, both as written and as applied." *Id.* at ¶ 44. In support of that position, they assert that the acts of the Town Council in creating the WHHD were *ultra vires* because the mandates of the enabling legislation of both the State and the Town of Vienna were not followed. They further allege that the ordinance "contains no adequate and objective standard, guidelines, or other rational criteria for evaluating applications for certificates of appropriateness. It should, therefore, be declared invalid *ultra vires* and *void ab initio." Id.* As the Court has already rejected Petitioners first argument, it need not analyze whether these allegations present a legitimate basis for a void-for-vagueness claim. Further, although Michael Covel seemingly has standing to seek a declaratory judgment in the Fence Case concerning the claimed vagueness of the standards governing applications for COAs, it is not readily apparent how Petitioners have any standing to raise that issue in the Removal Case. Petitioners have never provided authority for their position on this issue, either on brief or at trial.

Michael Covel claims that the ordinance establishing the criteria to be considered when evaluating on application for a COA in the WHHD, specifically Town Code § 18-280.8(A), is unconstitutionally vague on its face and as applied. That section reads as follows:

> *Matters To Be Considered by the Board.*
> A. In its review of any application for a Certificate of Appropriateness, the Windover Heights Board of Review, or the Council, on appeal, shall consider the following aspects of a building, accessory building, structure, fence, or sign:
> 1. Exterior architectural features, including all signs, which are subject to public view at any time of the year from a public street, way, or place;

2. General design and arrangement;

3. *Texture and material*;

4. The *relation to similar features* of buildings, accessory buildings, structures, fences, or signs *in the immediate surroundings*;

5. *Harmony or incongruity with the old and historic aspect of the surroundings*;

6. The extent to which historic places and areas of historic interest in the District will be preserved or protected;

7. Special public value because of architectural and other features which relate to the cultural and artistic heritage of the Town of Vienna.

Vienna Town Code § 18-280.8(A) (emphasis added). Petitioners contend that this section is devoid of specific criteria that the Board of Review could consider in evaluating COA applications. Therefore, according to Petitioners, home-owners in the WHHD would not be able to appropriately determine the limitations on the free use of their properties and could be subjected to totally arbitrary decisions by the Board on their applications.

The Town responds that Code § 18-280.8(A) sets out more than sufficient criteria to put homeowners in the WHHD on reasonable notice of the limitations attendant to construction of buildings or other structures in the district. The Town further argues that, in addition to having the right to address the Board of Review on an application for a COA, a homeowner has further protection by way of a right to a public hearing before the Town Council in the event that the Board of Review denies an application for a COA.

Vague laws implicate two important societal values. First in order "to steer between lawful and unlawful conduct . . . laws [must] give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972). Second, in order to prevent arbitrary and discriminatory enforcement of laws, those laws must provide sufficient standards to assure non-discriminatory enforcement. Unduly vague laws inappropriately delegate decision-making to those tasked with the implementation, rather than enactment of the laws, thereby increasing the danger of *ad hoc* and arbitrary enforcement of the laws. *Id.* The United States Supreme Court has also recognized, however, that absolute certainty is neither possible nor in some cases desirable. The Court articulated over fifty years ago that:

> Few words possess the precision of mathematical symbols, most statutes must deal with untold and unforseen variations in factual situation, and the practical necessities of discharging the business of government inwardly limit the specificity with which legislators can spell out prohibitions. Consequently, no more than a reasonable degree of certainty can be demanded.

*Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 340, 72 S. Ct. 329, 96 L. Ed. 367 (1952).

The United States Supreme Court has further opined that the standards for evaluating whether a statute is impermissibly vague should not be mechanically applied. In fact, the Court has enunciated that "[t]he degree of vagueness that the Constitution tolerates, as well as the relative importance of fair notice and fair enforcement, depends in part on the nature of the enactment." *Village of Hoffman Estates v. The Flipside Hoffman Estates, Inc.*, 455 U.S. 489, 498, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982). As a result, the Court has expressed "greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe," and has recognized that "economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow." *Id.* (*citing Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S. Ct. 839, 31 L. Ed. 2d 110 (1972)).

The holdings and underlying rationales of decisions rendered by Virginia's highest court are entirely consistent with these United States Supreme Court decisions. In *Andrews v. Board of Supervisors of Loudoun County*, the Supreme Court of Virginia reiterated that zoning is a legislative power that the state could delegate to localities but that, when the localities further delegated that authority, appropriate and defined standards needed to be enacted in order to avoid arbitrary enforcement. 200 Va. 637, 639, 107 S.E.2d 445, 447 (1959) (citations omitted). Yet, the Supreme Court of Virginia has also recognized that not every detail of authority delegated by local governments can be designated in writing and, therefore, "the determination of [some] facts must be left to the honest judgment of some designated official or board." *Ours Properties, Inc. v. Ley*, 198 Va. 848, 851, 96 S.E.2d 754, 757 (1957).

In *Ours Properties*, a landowner claimed that the City of Falls Church had unconstitutionally delegated certain zoning powers to the City's building inspector, thereby conferring on him "arbitrary and despotic powers." *Id.* at 850, 96 S.E.2d at 756. Petitioner further claimed that the provisions delegating

authority to the building inspector to grant or deny building permits were void for vagueness as they failed to provide "clear and precise standards" to be utilized by the inspector in his decision-making. *Id.* The Circuit Court rejected both of these contentions, and the Supreme Court affirmed. The Supreme Court ruled that all such ordinances are presumed to be valid and that the burden was on one challenging such an ordinance to establish its invalidity. *Id.* at 850, 96 S.E.2d at 756. The Court further noted that a legislative body, such as a city council, must work through others to perform some of its duties since it does not sit continuously and, therefore," considerable freedom to exercise discretion and judgment must be accorded officials in charge under a zoning ordinance. . . ." *Id.* at 851, 96 S.E.2d at 757. Thus, as public officials are presumed to discharge their duties honestly and in accordance with the law, the Court accepted that "[u]nless we are certain that [an] ordinance is so plainly and palpably inadequate as to offend the Constitution, we must uphold it." *Id.* The *Ours Properties* Court acknowledged that this principle was particularly applicable when the law provided for judicial review of any decisions made by the public official. *Id.*

More recently, in *Helmick v. Town of Warrenton*, 254 Va. 225, 492 S.E.2d 113 (1997), the Supreme Court reiterated these guiding principles. In *Helmick*, a landowner challenged the town's refusal to consent to the vacation of a sub-division plat, asserting, *inter alia*, that the relevant town ordinance was unconstitutional as it contained no guidelines or criteria to be evaluated when determining whether to vacate such a plat. While acknowledging the general rule established in *Andrews* that guidelines must accompany the delegation of legislative authority, the *Helmick* court recognized that this requirement had long been subject to an exception, first set out in *Gorieb v. Fox*:

> where it is difficult or impracticable to lay down a definite rule, or where the discretion relates to the administration of a police regulation and is necessary to protect the public morals, health, safety, and general welfare.

*Gorieb*, 145 Va. 554, 563-64, 134 S.E. 914, 917. The Court explained that the Gorieb exception was premised on the recognition that legislation cannot possibly address all variables which could arise in the administration of such delegated authority. *Helmick*, 254 Va. at 232, 492 S.E.2d at 117. Finding that the circumstances presented in that case fit "neatly into that category of circumstances in which specific guidelines for making the decision are difficult to craft and depend on local conditions" and that an "aggrieved party

has recourse through the courts," *id.* at 233, 492 S.E.2d at 117, the Supreme Court upheld the trial court's dismissal of the case on demurrer. *See also National Maritime Union of Am., AFL-CIO v. City of Norfolk*, 202 Va. 672, 683, 119 S.E.2d 307, 314 (1961) (applying *Gorieb* exception to the *Andrews* rule where more definite standards were found to be impractical).

Here, in the Fence Case and in the Removal Case, Petitioners claim that Town Code § 18-280.8(A) is unconstitutionally vague and grants excessive unbridled authority to the Board of Review to make decisions affecting the properties in the WHHD. Previously, this Court sustained, in part, the Town's demurrer to the declaratory judgment counts, ruling that Town Code § 18-280.8(A) was not unconstitutionally vague. That code section, like the corresponding provisions in *Gorieb, Helmick,* and *National Maritime,* does not lend itself to precise standards because the overarching goal of preserving the WHHD in a viable manner is not conducive to the delineation of the type of unwavering specifications which Petitioners claim must be present in this ordinance. To the contrary, the Board of Review is tasked with assuring that the structures within the district maintain the congruity and harmony with the surrounding features of the district that the Town Council set out in Town Code § 18-280.1. More specificity in Town Code § 18-280.8(A) would have served to unduly restrict the discretion that the landowners could exercise when erecting structures on their properties. Diverse designs, arrangements, textures, and materials could, and have been utilized in the WHHD, while still maintaining the integrity of this historic district. Thus, as the Supreme Court recognized in *Ours Properties* and *Helmick,* appropriate discretion has to be afforded to the members of the Board of Review to make decisions on an individual basis, application by application, especially when aggrieved landowners retain the right to access the Town Council and the courts if they disagree with a decision of the Board of Review.

Nothing in the entire record of these proceedings gives this Court reason to believe that the Board of Review has acted in an arbitrary manner based upon any imprecision in the ordinance. Indeed, but for the decisions leading to these appeals, each of the Petitioners has acknowledged that their other applications for COAs have received favorable consideration from the Board of Review. Petitioners' argument is premised on the possibility that abuses could potentially occur, not that arbitrary decisions have been made by the Board in the past. As the Supreme Court of Virginia has recognized that public officials are presumed to undertake their duties lawfully and honestly, this Court finds that Town Code § 18-280.8(A) suffers from no greater infirmity of indefiniteness than the corresponding provisions the Supreme Court has found valid in *Ours Properties, Gorieb, Helmick,* and *National Maritime.*

This Court is similarly unconvinced by the other arguments advanced by the Petitioners in support of their position that the ordinance is unconstitutionally vague, either as applied, or on its face. Initially, Petitioners never articulate why they contend that the ordinance is unconstitutionally vague as applied to them. At all relevant times, Michael Covel fully understood that the Town was taking the position that he needed to supply a color for the fence he wanted to construct on his property in order to satisfy the application requirement of the Town Code. Further, Petitioners cite no authority supportive of a conclusion that their removal requests were negatively affected by any unduly vague provision of the Vienna Town Code. Thus, any "as applied" void-for-vagueness attack by any of the Petitioners in either the Fence Case or the Removal Case must fail. Therefore, in order to mount a viable "on its face" void-for-vagueness attack, Petitioners "must demonstrate that the law is impermissibly vague in all its applications." *Village of Hoffman Estates*, 455 U.S. at 497. Petitioners have not advanced such an argument explicitly and any possible implicit argument to that effect fails for the reasons set out above. Consequently, the Court finds Petitioner's void-for-vagueness arguments unsupported by either the governing authorities or the evidence presented in this case. Accordingly, this Court rejects Petitioners' "as applied" or "on its face" void-for-vagueness arguments in their totality.

The Court does not find that either of the cases relied upon by Petitioners on brief, *Fried Riverpoint Bldg. Comm.*, 218 Va. 659, 239 S.E.2d 106 (1977) (addressing effect of restrictive covenant on property in dispute between private parties), or *O'Connor v. Smith*, 188 Va. 214, 49 S.E.2d 310 (1948) (interpreting Virginia Bulk Sales Act), provides any viable legal support for Petitioners' argument on this issue.

(3) *That the Decisions of the Town Council Denying Petitioners' Requests To Have Their Properties Removed from the WHHD And the Decisions of the Board of Review And the Town Council Denying Michael Covel's Application for a COA To Build a Fence Were Arbitrary And Capricious And Therefore Improper*

In Count I of each of the instant cases, Petitioners appeal decisions of the Vienna Town Council. In the Removal Case and the PMY Case, Petitioners assert that the Town Council's decisions denying their requests to have their properties removed form the WHHD were arbitrary, capricious, and unreasonable. In the Fence Case, Michael Covel claims that the denial of his application for a COA to build a fence was equally unreasonable. Thus, they

contend that this Court must reverse each of these decisions. The Town replies that each of these decisions was made in good faith after public hearings, was based upon the known facts, and was intended to further the integrity and preservation of the WHHD.

The legal principles which inform the Court's analysis of these contentions are well-settled. Pursuant to Va. Code § 15.2-2306(A)(3), a court may reverse or modify a locality's decision regarding historic preservation issues if it finds that the locality's decision was contrary to law, arbitrary, or an abuse of discretion; otherwise, the decision should be affirmed. *Norton v. City of Danville*, 268 Va. 402, 407, 602 S.E.2d 126, 128-29 (2004). Such determinations by localities are legislative decisions, which are presumptively valid. *Id.* at 408, 602 S.E.2d at 129. This presumption of legislative validity equates to a presumption of reasonableness. *Board of Supervisors of Fairfax County v. Robertson*, 266 Va. 525, 532, 587 S.E.2d 570, 575 (2003). The burden of proof falls squarely on a party challenging such legislative acts to establish that the decision was "clearly unreasonable, arbitrary, or capricious, and that it bears no reasonable or substantial relation to the public health, safety, morals, or general welfare." *Norton*, 268 Va. at 409, 602 S.E.2d at 130 (*quoting Turner v. Board of Supervisors*, 263 Va. 283, 288, 559 S.E.2d 683, 686 (2002)). If a party challenging such legislative action introduces some probative evidence of unreasonableness, then, the legislative body must introduce some evidence of reasonableness. Norton, 268 Va. at 409, 602 S.E.2d at 130; *Board of Supervisors v. McDonald's Corp.*, 261 Va. 583, 589, 544 S.E.2d 334, 338 (2001). If sufficient evidence of reasonableness is introduced "to make the question fairly debatable, the ordinance 'must be sustained.' If not, the evidence of unreasonableness defeats the presumption of reasonableness and the ordinance cannot be sustained." *Norton*, at 409, 602 S.E.2d at 130 (*quoting Board of Supervisors v. Snell Constr. Corp.*, 214 Va. 655, 202 S.E.2d 889 (1974)). An issue is "fairly debatable when the evidence offered in support of the opposing views would lead objective and reasonable persons to reach different conclusions." *Id.* (*quoting Board of Supervisors v. Williams*, 216 Va. 49, 58, 216 S.E.2d 33, 40 (1975)).

Thus, Petitioners bore the initial burden to produce evidence of the unreasonableness of the Town Council's actions in denying the Petitioner's requests to have their properties removed from the WHHD and in upholding the denial of the COA for Michael Covel to construct his fence. Petitioners presented various arguments in support of their position that they met this burden of production. The Court will address each of these arguments.

### a. *Arguments Relating to Each of the Removal, Fence, and PMY Cases*

Initially, Petitioners assert that the Town Code provisions governing enforcement of the WHHD are devoid of true standards establishing legitimate criteria upon which to determine the legitimacy of an application for a COA. Thus, according to Petitioners, the relevant Town Code provisions are invalid and unenforceable *in toto*. This argument seemingly ignores the Supreme Court's decision in *Norton* wherein the Court specifically ruled that a trial court's limited authority in an appeal pursuant to Va. Code § 15.2-2306(A)(3) was to review the city council's *specific act* under the ordinance, *not the validity of the ordinance itself*. *Norton*, 268 Va. at 407-08, 602 S.E.2d at 129.

Petitioners attempt to avoid the effect of the ruling in *Norton* by claiming that the lack of any real standards in the relevant provisions of the Town Code requires this Court to conclude that the Town's actions were necessarily arbitrary and unreasonable. The Court concludes that this argument presents a proposed distinction devoid of any true difference. The *Norton* court limited the scope of the permissible inquiry in such appeals to the locality's *specific act*. Therefore, this Court must examine whether the specific decisions to reject Petitioners' requests to have their properties removed from the WHHD and to deny Michael Covel's fence application as incomplete were in contravention of Virginia law. As this argument by Petitioners is in no way based upon these specific decisions of the Town Council, it is not properly cognizable under *Norton*.

### b. *Arguments Relating to the Removal Case And the PMY Case*

Petitioners next contend that the Town's decisions in 2003 and 2006 to reject their requests to have their properties removed from the WHHD were arbitrary and unreasonable because there has been disparate treatment of such requests by the Town since the early 1990s. In fact, in 1991, a petition was submitted by over twenty people to have their properties removed from the WHHD. See Pl. Exh. 27; but see also Pl. Exh. 30, evidencing the contrary views of homeowners within the WHHD. As a result, in 1992, enforcement of the WHHD was suspended for a year for the Town to study the issues in dispute. Petitioners further argue that, in 1991, a lot on which an office building had been constructed and the properties at 125 and 129 Pleasant Street were allowed to be removed from the WHHD. And, in the early-to-mid 1990s, the property at 120 Pleasant Street was also allowed to be removed from the WHHD and was later readmitted to the district. Consequently,

according to Petitioners, the Town's rejections of their requests to have their properties removed from the district were discriminatory and therefore arbitrary.

Petitioners are correct that unjustified discrimination in zoning decisions is impermissible under Virginia law. *See Board of Supervisors v. McDonald's Corp.*, 261 Va. at 591, 544 S.E.2d at 334. *But see Helmick v. Town of Warrenton*, 254 Va. at 231, 492 S.E.2d at 116 (opines that the motives of the governing body are generally immaterial (citations omitted)). However, to sustain the burden of establishing such impermissible discrimination, a landowner must establish that "a land use permitted to one landowner is restricted to another *similarly situated. Id. (quoting Board of Supervisors v. Rowe*, 216 Va. 128, 140, 216 S.E.2d 199, 209 (1975) (emphasis added). Here, Petitioners rely solely on the removal of the four properties from the WHHD and the subsequent re-admission of one of these properties to the district; however, they have presented no probative evidence as to how any of these properties were *similarly situated* to their properties within the WHHD.

Nor can Petitioners argue that these decisions of the Town in the 1990s to allow properties to be removed from the WHHD preclude the Town Council from denying their requests to have their properties removed from the WHHD about a decade later. In Virginia, it is firmly established that estoppel does not apply to a local government acting in its governmental capacity. *Wolfe v. Board of Zoning Appeals*, 260 Va. 7, 18, 532 S.E.2d. 621, 627 (2000); *Westminster-Canterbury of Hampton Rds., Inc. v. City of Virginia Beach*, 238 Va. 493, 503, 385 S.E.2d 561, 566 (1989); *Gwinn v. Alward*, 235 Va. 616, 621, 369 S.E.2d 410, 413 (1988). Thus, Petitioners' reliance on these earlier decisions of the Vienna Town Council concerning the WHHD is misplaced.

Petitioners further assert that members of both the Windover Heights Board of Review and the Vienna Town Council have conceded over the years that the lack of standards to be analyzed in making decisions concerning the properties in the WHHD have rendered such decisions totally arbitrary and capricious. In so arguing, Petitioners first rely upon the comment by Jennifer Steingesser, then a Senior Town Planner, at the December 5, 1995, meeting of the Board of Review that "the Town really does not have set standards. . . ." See Pl. Exh. 17. However, the Court notes that this quotation was taken at least somewhat out of context as the quoted sentence actually ended "but rather looks at what will blend in with the surroundings at any particular location." Next, Petitioners point to the diversity of opinions enunciated at the August 2004 work session of Vienna Town officials. See Pl. Exh. 121. Once

again, the Court finds Petitioners reliance on this evidence misplaced. First, these comments made in 1995 and 2004 are unrelated to the specific decisions at issue in these appeals from determinations of the Town Council rendered in 2003 and 2006. See *Norton* 268 Va. at 408, 602 S.E.2d at 129. Moreover, Petitioners cite no Virginia law which would support a conclusion that lack of total uniformity of opinions of personnel of a locality on general issues relating to enforcement of an historic district can constitute sufficient "probative evidence of unreasonableness" concerning specific decisions made on other occasions to satisfy a landowner's burden to produce such evidence. This Court declines Petitioners' invitation to create such a precedent.

This Court finds that Petitioners have not adduced credible probative evidence of unreasonableness on their claims in the Removal Case and have, therefore, failed to satisfy their initial burden of production. See *Norton*, 268 Va. at 408, 602 S.E.2d at 129. However, even if this Court were to have found that Petitioners had adduced sufficient probative evidence of unreasonableness to satisfy their initial burden, the Court's ultimate conclusion in the Removal Case would have been unchanged. The Town would merely have been required to meet any such evidence with sufficient evidence of reasonableness to make the question fairly debatable. See *Board of Supervisors v. Stickley*, 263 Va. 1, 7, 556 S.E.2d 748, 751 (2002) (*quoting, Ames v. Town of Painter*, 239 Va. 343, 348, 389 S.E.2d 702, 704 (1990)). The Court finds that the Town has more than met this burden.

At trial, the Town presented Warren Lee Almquist, an architect with familiarity of historic district issues. In fact, Almquist had served on the City of Alexandria's Parker-Gray District Panel from 1989 to 1993. Almquist walked almost the entirety of the WHHD and, at trial, presented pictures and a power point presentation depicting many of the structures within the WHHD. The Court found Almquist both knowledgeable and highly credible.

Almquist testified that the roads in the WHHD were very narrow, without sidewalks or curbing and that some of the streets and properties in the district had noted tree canopies. This testimony was entirely consistent with what is portrayed in the book *This Was Vienna*, See Def. Exh. 6. wherein pictures of some of the properties in the WHHD are discussed and/or depicted as they existed approximately a century or more ago. Almquist noted that most of the houses within the WHHD exceeded the fifty year old threshold established by the National Register of Historic Places, administered by the National Park Service. At trial, Almquist described the architectural styles of many of the properties in the WHHD. See also Def. Exh. 2; Mr. Almquist's Report. Within the WHHD, he found houses with Victorian, Italianate, Colonial Revival, and Four Square styles, which styles date back to the period

between 1870 and the 1920s. Although not all of the houses in the WHHD contained such historical styles, Almquist found the historical styles to be both prevalent and compatible. In fact, Almquist opined that the variety of styles from the same general era actually enhanced the architectural significance of the WHHD. In Almquist's expert opinion, the Windover-Heights Historic District contains structures which are both historically significant and architecturally compatible.

Almquist further testified that the color of new structures is important to the harmony and congruity these structures may share with older and potentially more historic aspects of their surroundings. Finally, Almquist testified that, in his opinion, the removal of the properties which are the subject of the instant appeals would have a detrimental effect on this historic district. Almquist's opinions were entirely consistent with the Town Council's decision to deny Petitioners' applications to have their properties removed from the WHHD.

In addition, when it rendered its decision to reject Petitioners' requests in 2003, the Town Council had the benefit of the Staff Report authored by Gregory Hembree, the Town's Director of Planning and Zoning. Pl. Exh. 124. This report addressed Petitioners' requests to remove the parcels located at 130 Pleasant, 346 Windover, 222 Lovers Lane, 200 Walnut, and 224 Walnut from the WHHD. In his report, Hembree described the WHHD as "a pristine area of old and eclectic houses that continues to exemplify [the] Statement of Purpose found in Town Code § 18-280.1." *Id.* at 1. His report addressed each of the individual requests for removal, the history, and historic features of each of the parcels and recommended against the requests relating to each of the five parcels.

Petitioners attempt to counter Almquist's and Hembree's opinions by claiming that very few of the historic homes and structures remain in the district. Further, they contend that the Town Code authorizes "maintenance and repair . . . of any structure within the district . . . without the necessity of applying for a COA. Town Code § 18-280.9. Hence, Petitioners assert that any legitimate basis for the creation of the district has long since passed and that future changes to the structures located in the district will effectively eviscerate any remaining remnants of the district's past. These arguments not only ignore the findings and opinions of Almquist and Hembree, but are also unsupported by the record in this case, outside of the personal opinions of Petitioners themselves. At trial, Petitioners adduced no testimony, expert or lay, other than their own, which would support a conclusion that, in 2003 and 2006, when their requests were denied, the WHHD was no longer a viable historic district.

The Court also found Petitioner's evidence and arguments concerning the location of some of their properties on the borders of the WHHD unpersuasive. Any historic district necessarily has properties that lie on the edges of the district and, therefore, adjoin other properties that do not share the historic nature of the structures within the district. To allow such properties to be removed from an historic district simply because they are located on the district's borders would ultimately place other properties within the district in the same situation, as they would become the properties lying on the outer limits of the district.

Moreover, not all of the properties at issue herein are located on the borders of the WHHD. To the contrary, some of these properties, such as Dr. and Mrs. Covel's lot at 224 Walnut Lane, lie within the heart of the district. Indeed, this 2.4 acre property has the highest elevation in WHHD and is surrounded by other houses within the WHHD. According to the Staff Report authored by Hembree, "removal of the subject property would literally leave a hole in [the WHHD's] heart."

Ultimately, on September 26, 2003, after multiple public hearings and after consideration of written and oral feedback from homeowners within the WHHD, the majority of whom were apparently against Petitioners' requests, the Vienna Town Council unanimously rejected the applications for removal of 130 Pleasant, 200 Walnut, 222 Lovers, 224 Walnut, and 346 Windover from the WHHD. At that public hearing, Councilman Lovelace spoke of the historic nature of the WHHD, See Def. Exh. 13, pp. 2-4. Councilwoman Robinson described the potential repercussions to the rest of the district if the Council authorized the removal of properties constituting 18.85% of the acreage in the WHHD, especially in light of Michael Covel's statement on his web site that he intended to "rezone his property at 130 Pleasant Street," (id. at pp. 4-5) and Mayor Seeman noted that Michael Covel had stated both in a 2002 facsimile transmission and on his website that his plans for 130 Pleasant and 346 Windover were "to demolish, rezone, subdivide, and develop this yet to be redeveloped land." Id. at p. 6. In fact, before voting on the request for removal of the properties, each member of the Town Council set forth reasons why he or she was going to vote against the requests for removal. As to each of the properties, a motion was duly made and unanimously adopted, concluding, in part, as follows:

> The removal of this property would adversely affect the integrity
> of the Historic District and enable architecturally inconsistent
> structures to be introduced adjacent to the remaining properties

in the District. The potential for redevelopment would undermine the purpose and intent of the Historic District.

*Id.* at pp. 7-12.

After full consideration of all of the evidence presented at trial, it is, at the very least, fairly debatable that these decisions of the Vienna Town Council were reasonable. Accordingly, this Court affirms the Town Council's decisions to reject the requests to have these five properties removed from the WHHD.

### c. *Arguments Relating to the PMY Case*

Although the parties presented significantly less evidence concerning their differences surrounding PMY's property at 210 Lawyers Road, the credible evidence establishes that the underlying issues concerning this parcel were virtually identical to those at play in the dispute concerning Petitioners' other properties within the WHHD.

On November 6, 2005, PMY Associates submitted a written request to the Town to have this property removed from the WHHD. Pl. Exh. 11. A public hearing on the request was held on April 17, 2006. Michael Covel, Dr. Covel, Dr. Matthew Stich, and Paul Heron spoke in support of the request. Stich and Heron were identified as having an interest in PMY Associates. The Town Planning Commission submitted a report recommending denial of the request. During public hearings on the request, Councilman Lovelace stated that he believed that removal of this property from the WHHD would be detrimental to the district. Mayor Seeman noted that she believed that the principals of PMY Associates had known that this property was within the WHHD when it was purchased in 2003. At trial, Heron testified that the request for removal had been made because there was nothing historic about this property or its surroundings, as it was located between a Post Office and an old church used as a private men's club. To the contrary, Warren Almquist testified that 210 Lawyers exhibited a German lat window and porch styles reminiscent of houses built in the early to mid 1800s to the 1920s. Although this property was on the border of the WHHD, it was one of the properties Almquist opined was part of a historically significant and compatible district. He testified that removal of this and the other WHHD properties owned by Petitioners would negatively affect this historic district.

In addition, the colloquies between the Petitioners and the members of the Town Council at the Public Hearing on April 17, 2006, (see Pl. Exh. 12) evidenced the ongoing friction between Petitioners and the elected

representatives of the Town. Based upon the history of the ongoing dispute between Petitioners and the Town Council concerning the WHHD, the members of the Town Council could reasonably have concluded that PMY's request concerning this property was simply one more attempt by Petitioners to undermine the continuing vitality of this historic district.

Once again, the Court finds that Petitioners have failed to present credible probative evidence of unreasonableness on the part of the Town and, thus, have failed to satisfy their initial burden of production. Further, even if this Court were to have found that Petitioners had presented probative evidence of unreasonableness by the Town in its decision to reject PMY Associates' request to remove the property located at 210 Lawyers Road from the WHHD, the final result would be unchanged. After full consideration of all of the evidence presented on this issue and the credibility of the witnesses at trial, this Court finds that the evidence of reasonableness of the Town's decision is sufficient to render this question, at the very least, fairly debatable. As such, the Court affirms the Town Council's decision to reject PMY's request to remove 210 Lawyers Road from the WHHD.

#### d. *Arguments Relating to the Fence Case*

In addition to the arguments of the Petitioners set out above, Michael Covel has advanced other arguments in support of his position that the Town Council's decision to reject, as incomplete, his application to construct a fence between his adjoining properties in the WHHD was arbitrary and unreasonable.

First, Covel argues that Town Code § 18-280.8 contains no reference to color among the factors the Board of Review is to consider in determining whether to grant a COA to build a structure such as a fence. He notes that this stands in stark contrast to the specific reference to color in Town Code § 18-274(b), part of the original ordinance authorizing the establishment of historic districts in the Town of Vienna. Thus, Covel contends that there was no basis for the Town to find his application incomplete based upon his failure to designate the color and finish he intended to put on his fence.

Second, he contends that Town Code § 18-280.4(B)(6) allows existing structures, including fences, to be painted or repainted without obtaining a COA. As a result, Covel asserts that any claim by the Town that the WHHD retains compatibility of paint colors on its structures is, at best, illusory.

Third, Covel argues that Va. Code § 15.2-2306(A)(1), the enabling statute, allows review boards to authorize the building of structures within historic districts based solely upon their architectural compatibility with the

other structures within the historic district and that paint color is irrelevant to architectural compatibility.

Finally, Covel contends that other applications for COAs have been approved by the Windover Heights Board of Review when the applications did not designate paint color, or were approved after the fact, when the construction had already taken place.

Although these contentions suffer, in part, from the same infirmities undermining the arguments advanced by Petitioners in support of their position concerning the removal requests, this Court will assume, without deciding, that Michael Covel has presented probative evidence of unreasonableness concerning the fence application decision. Covel's attacks are aimed principally at the underlying Ordinance, not the unreasonableness of the Town's actions concerning his fence application. Therefore, it was incumbent on the Town to adduce sufficient evidence of reasonableness to render the matter "fairly debatable." *Norton*, 268 Va. at 409, 602 S.E.2d at 130 (citations omitted).

The history of Covel's interaction with officials of the Town concerning this application is indeed instructive. Covel purchased the Pleasant Street property on October 30, 2002. By January 10, 2003, just over two months later, Covel sought to have this property removed from the WHHD. While that request was pending, Covel submitted his fence application on February 23, 2003. Although the Town's COA application form noted in bold print that "All Submittals Must Be Complete To Be Considered Filed," Covel responded to almost all of the questions on the application, including the question requesting proposed colors and finishes - by simply stating "N/A." See Pl. Proposed Exh. 5. Moreover, along with his COA application, Covel submitted a letter to Greg Hembree. See Def. Exh. 28. Covel began the second paragraph of that letter by stating:

> Please note this application for a fence permit is submitted in protest. The Windover Heights Historic District Ordinance *makes no logical sense* and is open to endless interpretation.

(emphasis added). Immediately thereafter in his letter, Covel submitted sixteen "observations and questions" challenging the propriety of various sections of the WHHD ordinance and information supplied to him by Town officials concerning it. He then ended his letter by stating:

> I expect a decision yes or no as soon as possible. There is no need to make a personal appearance for this application before the Windover Heights Review Board? [sic]

The obvious intent of Michael Covel in submitting this COA application was clear from its contents, its timing, and Covel's accompanying letter. The application had little, if anything, to do with a true desire to obtain authorization from the Town to build a fence on Covel's property; it was instead a challenge to the authority of the Town to place any restrictions on Covel's use of his property within the WHHD.

Covel's unmistakable intent was further demonstrated at the April 1, 2003, hearing on the COA application before the Windover Heights Board of Review. See Pl. Exh. 6. When asked whether the wood on the fence would retain its natural color, Covel initially responded that no decision had yet been made. When a follow-up question was posed as to the options being considered, instead of providing any information, Covel queried the Board about the Town Code. Eventually, when Covel was directly asked whether he was willing to provide the requested information, he replied that the Board was relying on sections of the Town Code that did not support their inquiry into color, and, as a result, he was not going to provide any color information. The Board, therefore, unanimously rejected the application for its lack of completeness.

Covel's unwillingness to provide any information concerning the colors he intended for the fence and any concrete information as to the finish to be applied continued at the public hearing held on Covel's appeal to the Town Council on May 17, 2003. See Pl. Exh. 8. When asked if the fence would be built with pressure treated wood, Covel replied that most fences use pressure treated wood. When asked about color, Covel again responded that no decision had yet been made, even though almost three months had elapsed since the color impasse at the Board of Review hearing. And, when asked about his intended finish for the fence, Covel replied solely that the finish would probably be on both sides of the fence. When Councilman Olson questioned the reasons for the evasive nature of Covel's responses to the Council's inquiries and noted that Covel would have had his fence by then if he had been more forthcoming, Covel was unmoved. The minutes of that meeting of the Town Council reflect that Covel was more intent on arguing against the legal basis for the Town's position than in providing the requested information to supplement his application. Hence, the Council affirmed the denial of the application as incomplete.

It is within this historical context that this Court must determine whether the Town has adduced sufficient evidence of reasonableness to defeat the arguments advanced by Covel in support of his position that the Town Council's decision to affirm the denial of his COA application as incomplete was arbitrary and unreasonable.

Initially, although there may be some validity to Covel's legal argument contrasting the absence of wood color as a factor for consideration in reviewing a COA application in Town Code § 18-280.8 with the inclusion of wood color among the factors in Town Code § 18-274(b), that distinction does not alter the Court's ultimate conclusion. In order to assure that structures, like fences, are in harmony with the old and historic aspects of the WHHD, as required by subsection (5) of Town Code § 18-280.8, subsection (3) of that Code section mandates that the Board of Review consider the materials that are a part of any such structure to be built in the district. It cannot be seriously questioned that paint would constitute a "material" on a structure such as a fence. And, at trial, Warren Almquist testified that color is an important factor in determining the harmony and congruity of a structure with the old and historic aspects of its surroundings. Thus, it was entirely reasonable for the Town to require that a person provide the color and finish intended to be applied to a fence as a necessary component of a COA application.

Moreover, Almquist's testimony more than adequately refutes Covel's second argument that the Board of Review's focus on color contravenes the limitation on the authority of such boards pursuant to Va. Code § 15.2-2306(A)(1) to review only the architectural compatibility of proposed structures with other structures within an historic district. Almquist made it clear that the color of a structure is an important facet of the analysis which must be undertaken to determine the structure's architectural compatibility with the other structures in an historic district. As a result, the Court need not address whether it agrees with Covel's restrictive view of the actual authority of review boards pursuant to that Va. Code section.

Covel's third argument that the Town's focus on paint color is unreasonable because it applies only to new structures and not to existing structures is equally unavailing. The credible evidence adduced at trial establishes that the WHHD has retained its architectural integrity to this time, notwithstanding the fact that the ordinance could prove problematic in the event that a homeowner in the district decided to repaint a home in a manner inconsistent with the surrounding structures. To extend the homeowners' discretion to the painting of new structures without any controls by the Town, would exacerbate, not alleviate, this potential problem. At trial, this Court posed various hypothetical situations relating to the painting of the fence to

counsel for Covel, wherein acceptance of Covel's position on this issue could lead to results absolutely incompatible with an historic district of this nature. Thus, the Town's insistence that Covel provide this basic information on his fence application was entirely reasonable.

Further, the Court rejects Covel's argument that the denial of this COA application was unreasonable because other COA applications had been accepted by the WHHD Board of Review where (1) the color for the structure was not designated on the application or (2) the application was submitted after the construction had already been completed. The evidence presented at trial does not support a conclusion that Covel's COA application was subjected to discriminatory treatment by either the Board of Review or the Town Council. To the contrary, both the Board and the Council gave Covel every opportunity to supplement his application, but he steadfastly declined to do so. In addition, the examples of claimed inconsistent treatment of other applications for similar fences do not support Covel's position. The fence built by Jason and Virginia Child in October 2005 was constructed with pressure treated lumber which originally has a natural yellowish tone and which becomes light gray as it ages. Although no specific color was designated in the Child's application (see Pl. Exh. 117), the fence had already been built when the application was submitted and the Board of Review could reasonably have concluded that "N/A" as to color and finish on this after-the-fact application meant that there was to be no additional color or finish for this already constructed fence. The absence of any contrary evidence by Covel at trial apparently establishes that such a conclusion was well-reasoned. Similarly, the August 1998 application of Francis and Joan Lillis (see Pl. Exh. 119(a)) to build a "green" fence on their property at 313 Windover Avenue does not provide any greater support for Covel's argument. Here, the Lillises included the color of the fence in their COA application. Moreover, at the time the Board of Review ruled on this application, the fence had already been constructed and the tone of the green color was observable by the Town's inspector. Nor is the application of Carter and Helen Ide to replace the existing fence on their property at 246 Lawyers Road (Def. Exh. 7Y) relevant evidence on this issue. This was an application for a *replacement* fence, for which a COA was not even required pursuant to Vienna Town Code § 18-280.4(B)(1). Moreover, like the Childs, the application submitted by the Ides stipulated that they would be using pressure treated lumber for their fence and this was noted on the color and finish line on their COA application. Once again, no evidence was presented at trial to question the wisdom of the conclusion that no other paints or finishes were gong to be utilized on the Ides' fence.

The Court further finds unconvincing Covel's argument that the suspension of the WHHD in 1991 to 1992 is relevant to Covel's position on this issue. No evidence was presented at trial that any of the properties affected by a temporary suspension of the district over a decade before the time period relevant here were similarly situated to Covel's property.

Finally, the Court rejects Covel's argument that the Town's failure to designate and publish a list of specific colors that could be utilized when building structures within the WHHD renders the Town's decision concerning his fence application unreasonable. This argument goes to the enforceability of the ordinance itself, not the reasonableness of the Council's action on Covel's application. As set out earlier in this opinion letter, such a contention is not properly cognizable in an appeal of a decision made by the Council. See Norton, 268 Va. at 407-08, 602 S.E.2d 126, 129. Further, the record in this case does not establish the necessity for a delineation of specific colors acceptable for structures within an historic district. To the contrary, Warren Lee Almquist testified that the City of Alexandria did not have specific guidelines in effect at the time of the creation of the Parker-Gray Historic District in Alexandria. Further, Gregory Hembree testified that he would actually report proposed colors to the WHHD Board of Review which could then consider the proposed colors in conjunction with the existing surroundings in that area of the district. Such decision-making is totally consonant with the goal set out in Town Code § 18-280.8(4) to assure harmony and congruity of planned structures with the old and historic aspects of the existing surroundings. In fact, as Councilman Lovelace has noted (see Pl. Exh. 121), to establish more specific guidelines would be difficult. Indeed, any effort to promulgate binding guidelines could lead to the creation of inflexible standards totally unnecessary for the preservation of the integrity of this district. Hence, the failure of the Town of Vienna to mandate the use of only specific colors on structures to be built within the WHHD cannot provide a basis for this Court to find that the Town was unreasonable in its rejection of Covel's fence application.

Ultimately, in deciding the fence application issue, this Court must focus its analysis on the reasonableness of the decision to reject this specific COA application. However, this Court need not and should not determine the reasonableness of the Town's action in a vacuum. As of May 19, 2003, when the Town Council affirmed the Board of Review's decision to reject Covel's application as incomplete, substantial, and at times acrimonious, differences had long existed between Michael Covel and members of the Vienna Town Council. In late 2002, Covel had purchased his Pleasant Street property knowing it was located within the WHHD. Then, within a very few months

thereafter, Covel had petitioned to have this property and Covel's Windover Avenue property (purchased that very day) removed from the district and, in addition, be the subject of a less than specific COA fence application, accompanied by a clearly oppositional cover letter. Thereafter, notwithstanding entreaties by Town officials for Covel to merely supplement his COA application, Covel instead demurred and stood his ground. Not only was it reasonable for the members of both the WHHD Board of Review and the Vienna Town Council to conclude that Covel's fence application was intended to create a "test" case to challenge the authority of the Town to enforce requirements for construction within the WHHD, that conclusion was virtually mandated by the circumstances orchestrated by Covel. This Court reached that very same conclusion after listening to Michael Covel testify at trial.

In order to sustain its burden of production in an appeal of one of its legislative decisions, "the governing body is not required to go forward with evidence sufficient to persuade the fact-finder of reasonableness by a preponderance of the evidence [but] must only produce evidence sufficient to make the question 'fairly debatable'." See *Board of Supervisors of Rockingham County v. Stickley*, 263 Va. 1, 7, 556 S.E.2d 748, 751 (2002) (*quoting Ames v. Town of Painter*, 239 Va. 343, 348, 389 S.E.2d 702, 704 (1990)). As the members of the WHHD's Board of Review and the Vienna Town Council could reasonably have concluded that Covel, if allowed, would have painted his fence in a manner to further challenge the authority of the Town officials and the integrity of the WHHD, it is, at a bare minimum, fairly debatable whether the Town Council was reasonable in its decision to affirm the Board of Review's denial of Covel's COA application as incomplete. Consequently, this Court affirms that decision of the Town Council.

### III. *Conclusion*

In his opening statement, counsel for the Town advised the Court that this is a case about a fence. Although the genesis of this litigation may have arisen out of the rejection of an application for a COA, counsel's attempt to define the scope of the dispute by reference to the fence application over-simplifies a more fundamental disagreement between the parties. Petitioners herein fervently believe that they have certain inalienable rights in their property, upon which the Government should not be allowed to infringe. The officials of the Town believe just as earnestly that they have an affirmative obligation to protect the rights of all of the citizens of Vienna and to assure

that the laws enacted by the people's chosen representatives are upheld. The gulf between these competing views is vast, and the principles articulated by the parties are held by many others throughout this country.

It is not, however, the role of this Court to choose between these two diametrically opposed visions of the proper role of government or to attempt to rewrite legislation to create more perfect laws. The proper role of a member of the judiciary is simply to rule on the legal positions advanced by the parties to the litigation based upon the evidence presented and the applicable legal authorities.

Over eighty years ago, the Supreme Court of the United States addressed the dilemma posed by the same competing views of appropriate governmental authority that are at issue here. In part, the Court wrote as follows:

> Building zone laws are of modern origin. They began in this country about twenty-five years ago. Until recent years, urban life was comparatively simple; but with the great increase and concentration of population, problems have developed, and constantly are developing, which require, and will continue to require, additional restrictions in respect of the use and occupation of private lands in urban communities. Regulations, the wisdom, necessity, and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive. Such regulations are sustained, under the complex conditions of our day, for reasons analogous to those which justify traffic regulations, which, before the advent of automobiles and rapid transit street railways, would have been condemned as fatally arbitrary and unreasonable. And, in this, there is no inconsistency, for while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world, it is impossible that it should be otherwise.

*Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 386-87, 47 S. Ct. 114, 71 L. Ed. 303, 4 Ohio Law Abs. 816 (1926).

The same principles underlying those words of the United States Supreme Court led the Virginia General Assembly to enact Article 7 of Title 15.2 of the Virginia Code, setting forth a full panoply of laws governing the

implementation of zoning schemes throughout the Commonwealth. And, the General Assembly has delegated the bulk of the right to regulate land use to the different localities within the Commonwealth. See Va. Code § 15.2-2280. So long as these local governments exercise those rights in a manner consistent with the statutes delegating that responsibility, the local representatives elected by the people are empowered "to improve the public health, safety, convenience, and welfare of [the citizens] and to plan for the future development of communities to the end . . . that residential areas be provided with healthy surroundings for family life. . . ." Va. Code § 15.2-2200.

Petitioners herein seek judicial review of the decisions rendered by the people's duly elected members of the Town Council of Vienna. For the reasons stated in this opinion, this Court holds that the decisions at issue herein violated no constitutional rights or statutory requirements affecting the Petitioners' interests in the subject properties. Further, the Court finds that none of the relevant decisions made by the Town Council were arbitrary, capricious, or unreasonable. Thus, consistent with longstanding principles underlying the separation of powers inherent in our constitutional system of government, this Court defers to the wisdom of the people's elected representatives and affirms their legislative decisions at issue herein.

Accordingly, the Court finds for the Town of Vienna on each of the remaining counts in all three of these lawsuits.